FILED
2025 Jul-09 AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

UNITED STATES OF AMERICA, *
Plaintiff, * 5:25-cr-00269-CLM-HNJ-1
* April 14, 2025
vs. * Huntsville, Alabama
* 1:30 p.m.
JASON BRIAN SEAY, *
Defendant. *
***************************

TRANSCRIPT OF DETENTION AND PRELIMINARY HEARING
BEFORE THE HONORABLE HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

APPEARANCES

FOR THE UNITED STATES:
Robin Leann White
Sara Judah
DOJ-USAO
United States Attorney's Office
200 Davis Circle, Ste 300
Huntsville, AL 35801
256-551-7358

FOR THE DEFENDANT:
Alex Darby
Federal Public Defender's Office
Northern District of Alabama
200 Clinton Ave W, Ste 503
Huntsville, AL 35801
256-684-8700

COURTROOM DEPUTY: Stephanie H. Buhler

PROBATION OFFICER: Ethan King

COURT REPORTER: Christina K. Decker, RMR, CRR
Federal Official Court Reporter
660 Gallatin Street SW
Huntsville, Alabama 35801
(256) 506-0085
Christina_Decker@alnd.uscourts.gov

**I N D E X**


| | |
|---|---|
| JORDAN SIRI | 5 |
| DIRECT EXAMINATION | 6 |
| BY MS. WHITE | 6 |
| CROSS-EXAMINATION | 17 |
| BY MS. DARBY | 17 |

**P R O C E E D I N G S**

(In open court. Defendant present.)

THE COURT: All right, folks. Good afternoon.

We're here today for a preliminary hearing as well as a detention hearing in the case United States vs. Jason Brian Seay. This is Case Number 5:25-MJ-1062.

I see we have Leann White and Sara Judah appearing for the government, along with Agent Jordan Siri. Good afternoon to all of you.

MS. WHITE: Good afternoon, Your Honor.

THE COURT: Good afternoon.

We have Alex Darby from the federal public defender representing Mr. Seay.

MS. DARBY: Good afternoon, Your Honor.

THE COURT: Good afternoon.

And good afternoon to you, Mr. Seay.

THE DEFENDANT: Good afternoon.

THE COURT: Mr. Seay, as you know, we are here for this preliminary hearing as well as a detention hearing based upon, as you know, our discussion at the initial appearance last week.

I'm sure the parties are ready to proceed.

As I understand it, Ms. Darby, at this time Mr. Seay will consent to detention with leave to reopen; is that correct?

MS. DARBY: Yes, Your Honor.
THE COURT: Okay. I will issue an appropriate order as to detention, then. And, thus, at the conclusion of this proceeding, Mr. Seay, I am going to remand you to the custody of the U.S. Marshal pending further proceedings in your case.
So let's go ahead and proceed with the preliminary hearing here.
You may proceed with your case in chief here, Ms. White.
MS. WHITE: Thank you, Your Honor. I would like to call Special Agent --
THE COURT: Yes, Ms. Darby?
MS. DARBY: I'm so sorry, Your Honor. Just to the extent that there are any witnesses in the audience, we would just invoke the rule.
THE COURT: Okay.
MS. WHITE: Not --
THE COURT: No witnesses? I'm sorry?
MS. WHITE: Not any witnesses that we see here, Your Honor, for the government.
THE COURT: Okay. All right. You may proceed, then.
Well, you have one witness, but no other non agents here, right?
MS. WHITE: Right. Just one.
THE COURT: Just one.

JORDAN SIRI,

having been first duly sworn by the courtroom deputy clerk, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: Jordan Siri. J-O-R-D-A-N. S-I-R-I.

DIRECT EXAMINATION

BY MS. WHITE:

Q Special Agent Siri, could you just briefly tell who you work for and what you do?

A Yeah. I am a special agent with the FBI assigned to the Birmingham division in the Huntsville resident agency.

I am assigned to the criminal squad. And I investigate various criminal matters, including crimes against children.

Q And did you investigate the charges of production of child pornography and attempted production of child pornography and possession of child pornography against Jason Seay?

A I did.

Q In that investigation did you obtain a search warrant for his residence?

A I did.

Q And when was that?

A I obtained the search warrant on March 6th, 2025, and it was executed on March 7th, 2025.

Q And the defendant's residence where you executed the search warrant, is that located in Madison, Alabama?
A Yes, it is.
Q And is that within the Northern District of Alabama?
A It is.
Q What did the search warrant permit the search and seizure of?
A Electronic devices.
Q For what reason?
A To look for evidence of child pornography.
Q When you executed the search warrant on March 7th of this year, approximately how many devices did you seize that day?
A Over 20 devices.
Q And has there been a forensic examination conducted on all of these devices at this point?
A Not all of the devices.
Q Could you please explain further?
A Sure. So we seized over 20 electronic devices. A phone, a desktop computer, and a laptop, and an external hard drive were all submitted to the forensic laboratory for imaging.
The other devices have either not been examined yet by a forensic examiner or they have not been submitted to the lab.
Q And on the desktop, how large a drive is that?
A So the desktop contained four hard drives for a total of eight terabytes of possible data storage.

Q And did forensics have any issues in trying to get into the device?
A They did. So both the desktop and the external hard drive were encrypted by a BitLocker, which is an encryption program offered by Windows, which encrypts entire drives.
So without either a BitLocker recovery key or a password to the device, those devices are unreadable.
Q But they were able to get into the device; is that correct?
A They were.
Q Did it also contain virtual machines?
A Yes. Both devices -- the desktop computer as well as the external hard drive -- also had virtual machines within them.
Q And what does that do to the process of forensics? How does that affect it?
A It increases the timeline for sure because like a virtual machine is in essence the same as a physical computer in terms of processing, so if you can think of the desktop being one physical computer, because there was virtual machines also in that they also have to be processed like a normal computer. So it could essentially double, triple, or quadruple the amount of forensic processing time.
Q So what devices have you been able to review at this time?
A A cell phone, a desktop computer, and the external hard drive.

Q Do you have an estimate of how many images and videos of child pornography that are on one or all of the devices?
A Sure. So the preliminary analysis of the desktop computer contained four different drives. One of those hard drives contained a virtual machine. That virtual machine contained approximately 29,000 videos that were flagged for potential child pornography.
The external hard drive had another approximately 9,000 images and videos of child pornography.
Q Now, have you reviewed all 29,000 plus the 8,000?
A I have not reviewed all of them. I have reviewed over a thousand.
Q That you have determined to be and meet the definition of federal child pornography?
A Yes.
Q Regarding the child pornography on the desktop that you saw, can you give us a general nature of the types of child pornography that you saw?
A Yeah. A lot of the children featured in the videos were I would guess to be appearing 12 years of age or younger. There were -- and the children in those videos were either having sex acts performed to them by an adult male or the adult male was making the child perform sex acts onto them.
The children in some cases were wearing bondage accessories in several of the videos. The adult male

ejaculates onto the child. Things of that nature.
Q Okay. Now, as to -- you said the SanDisk external hard drive, you were also able to review that or the -- I guess the examination?
A Yes.
Q Okay. And did you also locate child pornography images and videos within that external hard drive?
A I did.
Q Now, in looking at the images and videos in that hard drive, did you locate child pornography videos that you believe that this defendant produced?
A I did.
Q Can you please explain?
A So in many of the videos I observed Mr. Seay's face in the videos often when he was appearing to set up a camera. So there would be a camera that was already recording which would capture Mr. Seay. And then in other times he was also holding another device and appeared to be manipulating the device on the ground to try and change the angle of the recording device.
Q And in what type rooms would he have these cameras?
A They were primarily set up in a bedroom, a bathroom, and a closet; all areas that a personal would have a reasonable expectation of privacy.
Q Can you explain or describe a series of videos?
A I can. In one of the videos -- it was over 28 minutes

long. In the beginning of the video, Mr. Seay's observed on camera. He is manipulating a second device while another device is recording. It looks like the recording device is on a sink and it's facing a bathtub.

Mr. Seay is grabbing a towel, appearing to set up for some sort of bath. And then he disappears from the camera at the point when three children entered the view that appeared to be between probably eight to ten years of age. Mr. Seay is briefly observed again on the camera and then departs from the view of the camera again.

And all three of the children undress. They are fully nude. You can see their pubic area, chest, and buttocks at various times throughout the video. And for approximately 28 minutes they are nude in the tub taking a bath and playing.

Q Now, on this hard drive, did he have it organized into folders?

A Yes. They're what I call primary folders. So when the drive is opened, there would be several folders that were viewed. And if you enter one of those folders, there would often be a second or third folders within that folder itself.

Q Okay. And was there one primary folder that contained a lot of these videos that you just talked about?

A There was multiple.

Q Okay. Were there other videos that you saw which showed this defendant setting up a camera? In fact, even more than

one camera?

A There was. There was another series of videos that appeared to be taken from Mr. Seay's bathroom. And there was a camera that was again looks like it was positioned on the sink facing the shower and the bathtub. And then there was another camera that was in the closet of that bathroom.

And prior to that, I observed Mr. Seay on that camera in the closet manipulating the camera that was on the floor that appeared to be partially hidden from some clothes.

After that, two children enter the bathroom and they undress and are bathing in the bathroom.

After that, they go into the closet, where they're changing again -- observed the children's pubic area and breast area.

Q When you were watching these videos and you see the defendant's face and how he's doing the cameras, is he angling them at a certain way? Or can you explain?

A Yeah. It appears that the cameras are designed to capture the pubic area -- and to capture the children nude when they are undressing.

And the fact of two separate cameras I think further illustrates that where one camera is designed to capture the children while they are bathing and then the other camera in the closet is designed to capture the children if they chose to dress or undress in the closet.

Q Okay. Were there on some of the videos like a banner across the video that would indicate it might be streamed or live-streamed?

A Yes. On one of the videos that would appear to be taken in a bedroom, the recording device seemed to be placed on the floor and it was pointed at the beds that were in the bedroom. And across the top of that was a banner that said IP Webcam. And it had a message to basically remove the banner if you paid for the pro version of the program.

Q And in one of those -- can you describe one of those videos that you saw that did have the banner?

A Yeah. This was one of -- also a video where Mr. Seay was observed in the beginning of the video. At some point after that there was a child that entered that was probably around 14 to 15 years old. They entered into the bedroom. They removed their pants and underwear and bent over, which exposed their pubic area to the camera.

Q Now, on these videos that you have described for the Court, from the examination of the data from forensics, did those occur around about May 2017 to January 2018?

A They did.

Q Now, at the time of this defendant's arrest, did he make statements to you?

A He did.

Q Was he *Mirandized*?

A He was.
Q And did he agree to speak to you?
A He did.
Q Did you at one point ask him if he had ever touched a child inappropriately?
A I did.
Q And what was his response?
A He said that he had not, but he understood why I asked that question because somebody that was looking at the things that he was looking at and not supposed to look at, other individuals in a similar position may have acted on some of the behavior that they were watching.
Q Did he ask you any questions?
A He did. He asked to see what I had.
Q And how far into the interview were you when he asked you that question?
A Probably a minute after *Miranda*.
Q Now, did you show the defendant any child pornography?
A I did not.
Q Did you show him images, though?
A I did.
Q Can you explain?
A So I took screenshots of the recordings of videos that were found on the external SanDisk hard drive. And I took a screenshot to show either a room or an individual that was on

the camera.
Q Can you explain the first photo that you showed him?
A The first photo I showed him was taken in a bedroom that had green walls on it. And an individual appearing to be Mr. Seay was in view of the camera.
Q And did he identify himself as being that individual?
A He did.
Q Did you ask him if he knew what happened next?
A I did. And he told me that I knew what happened next.
Q Did you ask him about what the banner meant in the streaming of the video?
A I did. He told me that it was a program that was called the IP Webcam. And he used an old cell phone to record that video, but said that he did not share that video and it was not streamed to anybody else besides him.
Q Okay. But so it was streamed so he could view it live on another phone, is that --
A That's correct.
Q All right. Did you ask him why he recorded these videos?
A I did. He gave a variety of answers, depending on the time that I asked him and the video that we were speaking about.
Some -- one answer was that he wanted to listen to music and that's why the phone was set up in the bathroom in the way that it was. Another time he told me that he was

trying to observe the children in the bathtub to make sure that they were safe.

Q Did he explain why he set up a video to capture a teenager?

A He did. Because when I had asked him if he was concerned about the safety of the teenager, he said no. He told me that that camera specifically was always recording and then clarified that it was triggered by a motion. And I asked him why I never saw a recording of him if it was always recording and he told me that he didn't save those videos.

And eventually when I asked again, he told me the purpose of that video was to see the child's boobs.

Q Did he tell you how long that he has been looking at child pornography?

A Approximately the last ten years.

Q Did he tell you how long he's been recording child pornography?

A He estimated somewhere between 2016 and 2018 is when he started the recordings.

Q And did he tell you the last time that he viewed child pornography?

A The day before we executed the search warrant.

Q And on the day that you executed the search warrant, you took all of his electronic devices; is that correct? That you located?

A That's correct.

Q When you went to arrest him did he have a cell phone on him?

A He did.

MS. WHITE: I have no further questions at this time, Your Honor.

THE COURT: All right. Thank you, Ms. White.

MS. WHITE: Thank you.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. DARBY:

Q Good afternoon.

A Good afternoon.

Q Okay. So you said that you obtained a search warrant to search Mr. Seay's home in March of this year?

A That's correct.

Q What prompted you to seek that search warrant?

A I received a lead that had information that an IP address that was associated with Mr. Seay's residence had accessed a website that contained child pornography on it. And that on that -- that same activity on that IP address had also posted an image of child pornography.

Q Posted where?

A On the website.

Q Okay. And how long after -- excuse me -- when did you get

this tip?
A I believe the end of February or the very beginning of March. It wasn't far after -- after we executed the search warrant. So I would say probably only a couple of weeks before we executed.
Q Okay. And you said that you had seized over 20 devices from Mr. Seay's home?
A Yes.
Q Okay. And I notice you referenced for the two of them through the cell phone, the desktop, and the HD. And you said that some had been reviewed but some had not been yet examined or submitted. Can you give me those numbers, please?
A The numbers of what?
Q How many have been submitted but not examined.
A I believe there's two that are currently at the lab that have not been processed, if that's what you're asking.
Q Okay. Yes. Thank you.
And then have the rest of the devices been searched?
A No, they have not.
Q Okay. And why is that?
A Because the lab gets a lot of electronic devices. And so we try to prioritize them based on what we think the devices would contain evidence. And so we kind of start with so many of those devices. And as they work their way through, we submit additional devices to the lab for processing.

Q Okay. And you referenced a level of encryption that you found on the desktop and the external hard drive.
A Yes.
Q Did you find that level of encryption on other devices?
A The cell phone had a PIN pass code to it. I do not believe that it was BitLockered.
The external hard drive had BitLocker. The desktop computer had BitLocker. And the laptop also had BitLocker.
Q Okay. So of the other devices that have not yet been searched, do you know whether those are encrypted, as well?
A I do not.
Q Okay. Okay. You discussed some of the images that were found on the desktop. You said the videos, the 29,000 videos. In what form were those?
And I'm asking this poorly, but let me explain just a little bit. I know in some instances you can have, for example, images that might have been deleted but haven't been overwritten yet, that kind of files.
So were these files like that or were these files that were just currently active on the computer?
A Currently active on the computer.
Q And is that the same for the external hard drive?
A Both.
Q Okay.
A So his production style videos that I mentioned were just

on the normal hard drive. The full forensic examination report has not been made available to me, but I do know in speaking with the forensic examiner the processed device, there were images that were in like a cached file, which is what I think you are getting at.

Q So at least some of them had been deleted?

A (Nodded head.)

Q And you mentioned virtual machines that you had found on the desktop. Can you explain to me what that is?

A Sure. So my understanding the best way to think of a virtual machine is that it is a computer within a computer. So it is a digital emulation of a physical computer.

So if you were sitting on your computer at a desktop, there are programs in which you can create virtual machines that, like a Windows operating system, that live within that computer.

Q Okay. And you had mentioned that the file names seemed to correspond to dates of the production style videos.

In the complaint there are references to 2017 and 2018. I think you explained those, as well.

Were there any more recent files that you found?

A I have a -- there are folders that were on the desktop computer. And, again, the full final forensic report hasn't been made to me.

But in reviewing them with a forensic examiner, there

were folders that were marked 2024.

MS. DARBY: If I could have just a second please, Your Honor.

I don't think I have any further questions, Your Honor.

THE COURT: All right. Thank you.

Redirect?

MS. WHITE: Nothing further, Your Honor. Thank you.

THE COURT: All right. You may step down, Agent Siri.

No further witnesses as you've already stated, Ms. White.

Let me just ask the defense whether they have any witnesses. And if not, I will take any argument, of course.

MS. DARBY: We do not, Your Honor.

THE COURT: All right. Ms. White, the burden is upon the government, of course.

MS. WHITE: Your Honor, the defendant had secretly placed cameras in areas where one would expect privacy and where you would expect someone to undress and be in the nude.

He also angled them in certain angles within the room to ensure that when those individuals -- children -- would unclothe that he would be able to see them fully nude and engage in whatever activity that they were doing.

He had 29,000-plus videos, images of other child pornography which he had downloaded. And he admitted that it

was his.

Your Honor, we have proven, I believe, probable cause that he has committed the offenses of production or attempted production of child pornography as well as possession of child pornography.

THE COURT: All right. Thank you, Ms. White.

Ms. Darby?

MS. DARBY: Your Honor, at this time, we would request that the Court find no probable cause, but recognize that that is within the Court's discretion.

Thank you.

THE COURT: Thank you.

Well, I find that the testimony of Agent Siri and the evidence, of course, that he delivered in his testimony is credible and reliable. And, therefore, I find that there's sufficient credible and reliable evidence establishing a violation or violations of 18 U.S.C. Sections 2251(a) and (e), attempted production of pornography; and 18 U.S.C. Section 2252(a)(5)(B), possession of child pornography.

Therefore, there's a fair probability that there's probable cause to believe, Mr. Seay, that you have committed the violations alleged in the complaint as described therein. Therefore, your case will proceed to trial based upon this ruling.

As I mentioned at the outset, of course, based upon

the consent to detention, I will remand you to the custody of the United States Marshal pending trial in your case.

Ms. White, anything further we need to take up on this case from the government's standpoint?

MS. WHITE: Nothing further, Your Honor. Thank you.

THE COURT: Ms. Darby, anything further from the defense?

MS. DARBY: Nothing further, Your Honor.

THE COURT: All right. With that being the case, then, we are in recess.

Thank you very much.

(Whereupon, the above proceedings were concluded at 2:15 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

07-08-2025

Christina K. Decker, RMR, CRR — Date

Federal Official Court Reporter

ACCR#: 255